STATE of Minnesota, Respondent,

v.

Melvin Antwon GRIFFIN, Appellant.

No. A13–0400.

Court of Appeals of Minnesota.

May 12, 2014.

94

Lori Swanson, Attorney General, St. Paul, MN; and Mark A. Ostrem, Olmsted County Attorney, James P. Spencer, Assistant County Attorney, Rochester, MN, for respondent.

Cathryn Middlebrook, Chief Appellate Public Defender, Michael W. Kunkel, Assistant Public Defender, St. Paul, MN, for appellant.

Considered and decided by RODENBERG, Presiding Judge; WORKE, Judge; and KIRK, Judge.

## OPINION

RODENBERG, Judge.

Appellant Melvin Antwon Griffin appeals from his convictions of first- and third-degree criminal sexual conduct in violation of Minn.Stat. §§ 609.342, subd. 1(e)(i), .344, subd. 1(c) (2010). He argues that (1) his jury was not drawn from a fair cross-section of the community as required by the Sixth Amendment to the United States Constitution and article 1, section 6 of the Minnesota Constitution, (2) the district court abused its discretion by admitting evidence of his prior felony convictions for impeachment purposes, and (3) the district court erred by misreading part of the jury instructions on the charge of third-degree criminal sexual conduct. We affirm.

## FACTS

On December 9, 2011, appellant and S.L.B. were living at a sober house. According to S.L.B., appellant followed her upstairs and forcibly raped her. According to appellant, the two had consensual sex. He claimed that they had previously had consensual intercourse, which was cor-

roborated by a witness to the encounter. S.L.B.'s injuries on December 9 were consistent with both S.L.B.'s report of rape and with appellant's testimony that the two had engaged in rough (though consensual) sexual intercourse. When questioned by police after the incident, appellant denied ever having sex with S.L.B. Appellant was impeached at trial by evidence of both his prior inconsistent statements to police and his three prior felony convictions, admitted by the district court over objection. S.L.B.'s credibility was also attacked through testimony of other witnesses and through evidence of her prior convictions. A jury found appellant guilty of first- and third-degree criminal sexual conduct in violation of Minn.Stat. §§ 609.342, subd 1(e)(i), .344, subd. 1(c).

***The jury panel***

Immediately before trial, the court administrator distributed a jury list with demographic information concerning the prospective jurors. Appellant, a black male, challenged the panel's racial composition. He argued that the presence of only one black person in the 30–person jury pool was an underrepresentation of black persons as compared to the percentage of self-identified black persons in the population of Olmsted County. The prosecutor, acknowledging that appellant's counsel had received the demographic information on the morning of trial, argued that a challenge to the racial composition of the panel must be made in writing. When the district court asked appellant's counsel whether he had "any evidence or something to present to say that there [had] been a departure from law in the way that [the] jury ha[d] been ... assembled or summoned," counsel responded, "I do not." The district court denied the motion.

Appellant renewed his challenge to the jury panel's racial composition in a postverdict motion for a new trial, relying on demographic data from the 2010 United States census concerning Olmsted County and on demographic data regarding the composition of juries in Olmsted County from 2010 through the first half of 2012 obtained from the court administrator's office. The 2010 census data reflect that 4.8% of the Olmsted County population self-identifies as black persons, while the jury demographic data show that the percentage of black persons on Olmsted County jury lists has averaged from 1.29% to 1.72% over a period of two and one-half years. Mathematically, appellant's panel consisted of 3.33% black persons. Appellant argued that these statistical data were sufficient to demonstrate underrepresentation resulting from "systematic exclusion" of black persons from the selection process.

Although the district court found that the underrepresentation of black persons on Olmsted County juries is "chronic and unacceptable," it denied the postverdict motion. It reasoned that, "[w]ithout showing that there is not an alternative reason for the underrepresentation, [appellant] has failed to make a prima facie showing of a violation of the fair-cross-section requirement [of the Sixth Amendment to the United States Constitution]." The district court noted that the 2010 census data were not strong evidence of underrepresentation because they failed to account for legal eligibility restrictions on jury service.

***Admissibility of prior felony convictions to impeach appellant***

The district court addressed the admissibility of appellant's three prior convictions before trial. The three convictions, from oldest to most recent, include: (1) a controlled-substance conviction (in Illinois) from 1998, (2) a third-degree-assault conviction from 2006, and (3) a fourth-degree-criminal-sexual-conduct conviction from 2007. Appellant argued that use of the

convictions for impeachment would be more prejudicial than probative. The district court analyzed the admissibility of the prior convictions under the five factors set forth in *State v. Jones*, 271 N.W.2d 534, 538 (Minn.1978), and ruled that all three convictions were admissible. But due to the similarity of the prior sexual-assault conviction to the charges in this case, the district court required that conviction to be referenced only as an unspecified felony as set forth in *State v. Hill*, 801 N.W.2d 646, 651 (Minn.2011).

At trial, the first inquiry about appellant's prior convictions was by his attorney during direct examination:

> Q: Now ... you've been convicted of a felony from back in December of 2007, is that correct?
>
> A: Yes, sir.
>
> Q: You were also convicted of a felony assault in the third degree back in March of 2006?
>
> A: Yes, sir.
>
> Q: And you were also convicted of a felony controlled-substance crime in 1998 out of Illinois, is that correct?
>
> A: Yes, sir.

And the state's only reference to the prior convictions was during cross-examination of appellant and was even more fleeting:

> Q: You've been in trouble with law enforcement before, is that right?
>
> A: Yes, I have.
>
> Q: In fact, you have three prior convictions?
>
> A: Yes, I have.

Before summations, the district court instructed the jury that it "must not consider any previous conviction ... as evidence of guilt of the offense for which the defendant is on trial." The state made no reference to the convictions in its summation.

Appellant renewed his challenge to the admissibility of the prior convictions in his postverdict motion for new trial, arguing additionally that the reference to the unnamed felony allowed the jury to "assume the worst" regarding the nature of that felony. The district court denied the motion, noting that the manner in which the evidence was introduced at trial "did not call attention to the fact that the [unspecified] offense was not named."

### The district court's misreading of the jury instructions

Before closing arguments, the district court instructed the jury on both first-degree and third-degree criminal sexual conduct. For the first-degree charge, it read, in pertinent part: "Consent does not mean the existence of a prior or current social relationship between the defendant and [S.L.B.] or that [S.L.B.] failed to resist a particular sexual act." The identical definition of consent for the third-degree offense was then read, except that the district court inadvertently omitted the second reference to S.L.B.'s name. The parties brought the omission of her name to the district court's attention at a sidebar conference immediately after the instructions were read. The district court then re-read only the instruction for the third-degree charge, but misspoke, stating: "Consent does not mean the existence of a prior or current *sexual* [not "social"] relationship between the defendant and [S.L.B.] or that [S.L.B.] failed to resist any particular sexual act." (Emphasis added.) The district court then asked counsel if there were any objections, and both of counsel replied that they had none.

In appellant's postverdict motion for a new trial, he argued that the misreading of the instruction using the word "sexual" rather than "social" was error. He argued that, because evidence of the prior sexual relationship was relevant under Minn.Stat.

§ 609.347, subd. 3(a)(ii) (2010), and Minn. R. Evid. 412, the erroneous instruction could have confused the jury into believing that the evidence could not be considered on the issue of consent. The district court analyzed the motion as follows:

> The [district] court read the same wording in the instructions both when reading the elements of first-degree sexual assault and the first reading of the elements of third-degree sexual assault. The correctly worded instruction was also provided to the jury in writing. Neither attorney objected to the misreading, presumably because they did not notice. The [district] court did not notice the error, nor did the [district] court's staff. It is not reasonable to believe all twelve jurors noticed the one misstated word, did not notice when the intended word was read, and then did not look to the written instructions while deliberating. The jury did not inquire about the disparity between the second reading and either the first reading or the written instructions. Additionally, the mistaken reading was on the third-degree instruction. [Appellant] was convicted of both first- and third-degree criminal sexual conduct.

The district court then denied the motion, concluding that there had been no material misstatement of the law, and if there was, the error was not prejudicial. This appeal followed.

## ISSUES

I. Did appellant establish a prima facie showing that his jury panel violated the fair-cross-section requirement of the Sixth Amendment to the United States Constitution and article 1, section 6, of the Minnesota Constitution?

II. Did the district court abuse its discretion by admitting evidence of appellant's three prior felony convictions for impeachment purposes?

III. Did the district court commit reversible error by misreading a portion of the jury instructions on the charge of third-degree criminal sexual conduct?

## ANALYSIS

### I.

■ Minnesota cases concerning Sixth Amendment [1] challenges to the fair-cross-section requirement appear to apply a de novo standard of review. *See, e.g., Hennepin Cnty. v. Perry*, 561 N.W.2d 889, 895–97 (Minn.1997); *State v. Willis*, 559 N.W.2d 693, 700 (Minn.1997); *State v. Williams*, 525 N.W.2d 538, 541–44 (Minn. 1994). Other Sixth Amendment challenges are reviewed de novo. *See State v. Griffin*, 760 N.W.2d 336, 339 (Minn.App.2009) ("A speedy-trial challenge presents a constitutional question subject to de novo review."). We therefore review appellant's fair-cross-section claim de novo.

■ Provisions of the United States and Minnesota Constitutions protect a criminal defendant's rights to a fair and speedy trial. U.S. Const. amend. VI; Minn. Const. art. I, § 6. These include the requirement "that the jury venire ... reflect a fair cross-section of the community." *Willis*, 559 N.W.2d at 700 (citing

1. Appellant's challenge is brought under the Sixth Amendment to the United States Constitution as well as the similar provision in article 1, section 6 of the Minnesota Constitution. Although the Minnesota Constitution in some instances affords greater protection than the United States Constitution, *e.g., State v. Aske-rooth*, 681 N.W.2d 353, 361–63 (Minn.2004), we refer to these jointly as "Sixth Amendment" challenges for ease of reference. Appellant does not argue that his jury panel met the requirements of the United States Constitution but that the state constitution affords him greater protection.

*Taylor v. Louisiana,* 419 U.S. 522, 527–28, 95 S.Ct. 692, 696–97, 42 L.Ed.2d 690 (1975)). However, "[t]he Sixth Amendment does not guarantee a criminal defendant a jury of a particular composition or one that mirrors the community." *Williams,* 525 N.W.2d at 542 (citing *Taylor,* 419 U.S. at 538, 95 S.Ct. at 701–02; *State v. Holty,* 307 Minn. 478, 238 N.W.2d 615 (1976)).

> In order to establish a prima facie showing that the jury venire from which the petit jury was selected did not satisfy the fair cross-section of the community requirement, a criminal defendant must show that the group allegedly excluded is a "distinctive" group in the community, that the group in question was not fairly represented in the venire, and that the underrepresentation was the result of a "systematic" exclusion of the group in question from the jury selection process.

*Id.* (citing *Duren v. Missouri,* 439 U.S. 357, 364–67, 99 S.Ct. 664, 668–70, 58 L.Ed.2d 579 (1979)).[2] "The state may rebut a prima facie case by showing that aspects of the jury selection that produced the underrepresentation nonetheless advanced a significant state interest." *Perry,* 561 N.W.2d at 896 (citing *Duren,* 439 U.S. at 367–68, 99 S.Ct. at 670–71; *Williams,* 525 N.W.2d at 542). The parties agree that persons self-identifying as black are a distinctive group in the community, satisfying the first element of the *Williams* test. *See* 525 N.W.2d at 542.

We therefore turn to the second and third elements.

### Second element—unfair representation on the panel

■ Appellant relies on statistical evidence to support his Sixth Amendment claim. He asserts that a comparison of data from the 2010 United States Census with demographic data concerning Olmsted County juries from 2010 to mid–2012 establishes a prima facie case that his jury violated the fair-cross-section requirement.

■ We first address the limitations on the uses to which census data may reliably be put in the present context. The United States Census is an "actual enumeration" of the population, taken every ten years. U.S. Const. art. I, § 2. The data gathered are used to determine, among other things, proportional representation in the United States House of Representatives. *Wisconsin v. City of New York,* 517 U.S. 1, 5, 116 S.Ct. 1091, 1094, 134 L.Ed.2d 167 (1996); *see also Hippert v. Ritchie,* 813 N.W.2d 374, 377 (Minn.2012) (discussing Minnesota's redistricting based on census data). The census counts the entire population. *Wisconsin,* 517 U.S. at 5, 116 S.Ct. at 1094. But an "actual enumeration" of the population does not consider the eligibility requirements for jury service. Among other requirements, a juror must be at least 18 years old, a citizen of the United States, and able to communicate in the English language. Minn. R. Gen. Pract. 808(b). The census data do not identify the extent

---

**2.** Any challenge to a jury panel "must be made in writing and before the court swears in the jury." Minn. R.Crim. P. 26.02, subd. 3. The state argues that appellant's motion is untimely because it was not made in writing. But appellant's counsel did not receive the demographic data until the morning of trial. Under these circumstances, the district court acted within its discretion in addressing the constitutional issue on the merits and in implicitly determining that appellant's failure to satisfy the writing requirement of the rules of criminal procedure cannot bar appellant's constitutional claim. We therefore address the issue on the merits.

to which Olmsted County's self-identified black persons are eligible for jury service.

To satisfy the second element of a fair-cross-section claim, the appellant must show "that the group in question was not fairly represented in the venire." *Williams*, 525 N.W.2d at 542. Appellant argues that black persons were underrepresented on the panel called for jury service in his case, because the panel contained only 3.33% black persons, while the percentage of self-identified black persons in the community according to census records is 4.8%. The state argues that, "because [black] persons constituted only 4.8% of the population of Olmsted County according to the 2010 census figures, achieving a jury panel of 30 persons that mirrors the community is ... impossible." It contends that, "if appellant's jury panel had included one additional [black person], that distinctive group would have been overrepresented as a percentage of the population." But assuming that the 4.8% figure from the 2010 census has some statistical relevance concerning the percentage of black persons in Olmsted County who are eligible for jury service, we observe that the jury pool from which appellant's jury was chosen was 3.33% black (which is 1.47% lower than the percentage of census data concerning self-identified black persons in the community). The state correctly points out that, had the pool included one additional black juror, the percentage of black persons in the pool would have been 6.67%, or 1.87% higher than the percentage of self-identified black persons in the community.

The state argues that "these narrow and impossible margins do not and should not merit a new trial." We agree. It would place an onerous burden on the administration of justice in this state if such exacting adherence to demographic data was required in the juror-selection process.

But even if appellant had satisfied his burden on this element, his claim would still fail because he has failed to establish that the 2010 census demonstrates a "systematic exclusion" of black persons from the Olmsted County jury pool.

### Third element—systematic exclusion

To satisfy the third element, appellant must show that "over a significant period of time—panel after panel, month after month—the group of eligible jurors in question has been significantly underrepresented on the panels and that this results from 'systematic exclusion.'" *Id.* at 543. Systematic exclusion means that the underrepresentation is attributable to the juror-selection process and not alternative reasons such as individuals failing to show up for jury service. *Id.* In *State v. Roan*, our supreme court held that the juror-selection process, which "uses registered voters, driver's licenses, and registered Minnesota identification card holders," is constitutional. 532 N.W.2d 563, 569 (Minn.1995). And we note that this same selection process was used here. *See* Minn. R. Gen. Pract. 806 (listing the sources from which the jury pool is compiled).

In determining the extent of underrepresentation of a distinctive group, courts use a variety of statistical tools including, but not limited to, the absolute-disparity and comparative-disparity tests. *Williams*, 525 N.W.2d at 542–43. Absolute disparity is determined by subtracting the percentage of the group's representation on the venire from the group's percentage of the population in the community. *Id.* at 542. In *Williams*, the supreme court considered the difference between 3.7% of black persons in the population and 2.0% of black persons in the jury pool, or an absolute disparity of 1.7%. *Id.* It then noted that, "in a community in which African–Americans make up only 3.7% of

the population, a defendant could never meet the second part of the prima facie test if [only] the absolute disparity approach is used." *Id.* This is because the absolute-disparity figure will always be nominally small in such situations. The supreme court then used the comparative-disparity test, calculated by taking the absolute disparity and dividing it by the group's percentage of the population in the community. *Id.* at 543. The comparative disparity shows "the diminished likelihood that members of a cognizable group will be called for jury service in direct proportion to its incidence in the population as a whole." *Id.* In *Williams,* the comparative disparity was 46%. *Id.* The supreme court then noted that both approaches may be deceiving:

> The respective percentages of absolute disparity and comparative disparity developed in this case demonstrate with clarity that when the cognizable group in question constitutes a small percentage of the total population of a community, use of the absolute disparity method may distort reality in one direction but use of the comparative disparity method may similarly distort reality in the opposite direction.... The question whether the group in question was fairly represented in the particular venire from which the petit jury was chosen will not be answered by reliance on one particular statistical tool. Rather, courts should be free to use all the statistical tools available, including the absolute disparity figure, the comparative disparity figure, standard deviations, and any other such tools.

*Id.* (citation omitted). We therefore look at the overall statistical relevance of the data submitted by appellant, rather than relying on any one measure of disparity.

In order to show systematic exclusion, appellant must establish that the underrepresentation of black persons as jurors is the result of "unfair or inadequate selection procedures used by the state rather than, e.g., a higher percentage of 'no shows' on the part of people belonging to the group in question." *Id.* at 543. In context, this requires a demonstration that the underrepresentation was not the result of reasonable and plausible alternative possibilities shown by the statistical data. Appellant argues that "the burden of disproving all other possible reasons for these disparities is unreasonable and would likely be an impossible task for [any criminal defendant]." But appellant need not disprove *all* other possibilities. The statistical analysis relied upon here, a raw comparison of census data with jury-pool data, fails to make even a prima facie demonstration that there are not alternative and plausible—even likely—explanations for the claimed unconstitutional underrepresentation.

First, the census data reveal that 25.3% of the population in Olmsted County is under 18 years of age. This means that more than one-fourth of the data in the 2010 census are irrelevant to the jury-pool question because a count of the populace includes minors who are ineligible for jury service. *See* Minn. R. Gen. Pract. 808(b)(2) (requiring that jurors be at least 18 years old). The record reveals nothing to show the demographic breakdown of the population under age 18. On this record, we have no way of knowing what percentage of persons self-identifying as black are over the age of 18, and eligible for jury service.

Second, and we think significantly, "foreign-born persons" account for 9.4% of the Olmsted County population. This is an approximately 34% greater proportion of "foreign-born persons" than the state as a

whole.[3] Certainly many foreign-born persons are English-speaking citizens, but we cannot assume, and the record on appeal does not reveal, the percentage or number of foreign-born persons in Olmsted County who are ineligible for jury service. *See* Minn. R. Gen. Pract. 808(b)(1) (must be a citizen), (4) (must be able to communicate in English). *Williams* requires appellant to at least facially demonstrate the absence of alternative explanations for the underrepresentation in order to make a prima facie showing that his jury panel was constitutionally infirm. 525 N.W.2d at 543. Because appellant has failed to present evidence correlating the census figures to the percentage of self-identified black persons in Olmsted County who are qualified for jury service, the district court did not err in concluding that appellant failed to establish a prima facie case that his jury violated the fair-cross-section requirement of the Sixth Amendment.

## II.

■ When appealing the district court's evidentiary rulings, an appellant "has the burden of establishing that the [district] court abused its discretion and that appellant was thereby prejudiced." *State v. Amos*, 658 N.W.2d 201, 203 (Minn. 2003). When the district court has erred in admitting evidence, we then determine whether there is a reasonable possibility that the evidence significantly affected the verdict. *State v. Post*, 512 N.W.2d 99, 102 n. 2 (Minn.1994). If there is a reasonable possibility that the verdict might have been more favorable to the defendant without the evidence, then the error is prejudicial, and we will reverse and remand for a new trial. *Id.* To determine whether the error warrants a new trial, we consider "the manner in which the evidence was presented, whether it was highly persuasive, whether it was used in closing argument, and whether the defense effectively countered it." *Townsend v. State*, 646 N.W.2d 218, 223 (Minn.2002).

■ A prior conviction is admissible for impeachment purposes when it "was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect." Minn. R. Evid. 609(a)(1). To determine whether the probative value of admitting a prior criminal conviction outweighs its prejudicial effect, these factors must be considered:

> (1) the impeachment value of the prior crime, (2) the date of the conviction and the defendant's subsequent history, (3) the similarity of the past crime with the

---

3. Minnesota's statewide census numbers show 7% "foreign-born persons." The census tracks demographic groups based on self-identification and collects data concerning racial and ethnic groups such as "Black or African American, American Indian or Alaska Native, Asian," and others. Karen R. Humes et al., Overview of Race and Hispanic Origin: 2010, 2010 Census Briefs, 2 (March 2011) http://www.census.gov/prod/cen2010/briefs/c2010br–02.pdf. It also tracks persons self-identifying as having a "Hispanic Origin." *Id.* The Minnesota State Demographer also tracks statistical information for several immigrant groups, such as Latinos, Hmong, and Somalis. Media Release, State Demographic Center, Minnesota's Immigrant Populations Continue to Increase (June 17, 2004), http://www.demography.state.mn.us/resource.html?Id=7193. Somali and Ethiopian immigrants have comprised a significant number of immigrants to Minnesota over the last few decades. *Id.* The extent to which either or both of the county and state percentage of "foreign-born" persons is influenced by the immigrant population hailing from East Africa is not revealed by the record. If there is a significant population of immigrants from these regions, the record does not show what percentage are English-speaking citizens, over 18 years of age, and eligible for jury service.

charged crime (the greater the similarity, the greater the reason for not permitting use of the prior crime to impeach), (4) the importance of defendant's testimony, and (5) the centrality of the credibility issue.

*Jones*, 271 N.W.2d at 538. We review the district court's ruling for an abuse of discretion. *Amos*, 658 N.W.2d at 203.

■■■ Appellant argues that the district court abused its discretion in two ways: (1) by admitting evidence of any of the three prior convictions because the *Jones* factors did not weigh in favor of admissibility, and (2) by admitting all three felonies, but requiring one felony to be unnamed, thereby allowing the jury to "assume the worst" regarding the nature of the unnamed felony.

In considering the admissibility of the prior convictions, the district court engaged in a thorough analysis of all five *Jones* factors. It concluded that factors one and two favored admission of the prior convictions for impeachment purposes. It then concluded that factor three—similarity of past crimes to the crime charged—weighed against the admissibility of appellant's prior conviction of fourth-degree criminal sexual conduct. It limited the reference to that conviction as being a conviction of an unspecified felony, reasoning that this treatment of that offense would minimize any prejudice resulting from the similarity of it to the charge under consideration. *See Hill*, 801 N.W.2d at 651 (allowing impeachment with an unspecified felony as long as the felony is admissible under rule 609(a)).

The district court also found that the fourth factor—the importance of appellant's testimony—weighed against admission for all three prior convictions. But it then analyzed this factor in combination with the fifth factor—the centrality of the credibility issue—and determined that, on balance, the fourth and fifth factors weighed in favor of admissibility. *See State v. Swanson*, 707 N.W.2d 645, 655–56 (Minn.2006) (considering fourth and fifth *Jones* factors in combination).

We see no abuse of discretion in the district court's application of the *Jones* factors here. The district court was commendably thorough in its analysis and that analysis was entirely faithful to *Jones* and its progeny.

Appellant also contends that evidence of an unspecified felony, along with two other identified felonies, allowed the jury to "assume the worst" regarding the nature of the unspecified conviction. There may be some cases where this method of identifying some but not all of the specific convictions could be problematic. *Cf. Hill*, 801 N.W.2d at 650–53 (allowing impeachment with an unspecified felony in a case wherein the unspecified felony, the defendant's only prior conviction, was used for impeachment). But this is not such a case. The way the convictions were introduced at trial here mitigated any risk of prejudice to appellant and drew no special attention to the unspecified prior conviction.

Appellant's counsel artfully introduced the unspecified felony on direct examination before questioning appellant concerning the two identified felonies, drawing no special attention to the fact that the offense in the first conviction was not identified. The state did not make specific inquiry concerning the prior convictions on cross-examination. The district court properly instructed the jury that the prior convictions were not to be used as substantive evidence of guilt. The state did not reference appellant's prior convictions in its summation. And S.L.B.'s credibility was also attacked using the testimony of other witnesses and her prior convictions. Even if we were to conclude that the dis-

trict court abused its discretion by admitting the evidence, which conclusion the record does not support, the way the convictions were treated at trial would not warrant reversal in any event. Therefore, appellant is not entitled to relief on this ground.

### III.

Appellant contends that the district court erred in substituting the word "sexual" for the word "social" in its instructions to the jury concerning the charge of third-degree criminal sexual conduct. He argues that the error entitles him to a new trial. There was no objection at trial, but appellant raised the issue in his motion for a new trial.

■ Generally, when a party does not object to a jury instruction at trial, we review the allegedly erroneous instruction under the plain-error standard. *State v. Vance,* 734 N.W.2d 650, 655 (Minn.2007), *overruled on other grounds by State v. Fleck,* 810 N.W.2d 303 (Minn.2012). A contemporaneous objection allows the district court to cure the error. *State v. Sanders,* 598 N.W.2d 650, 656 (Minn.1999). Appellant argues that the harmless-error standard applies because his postverdict motion for a new trial preserved the issue for our review pursuant to Minn. R.Crim. P. 26.03, subd. 19(4)(f).

■ The harmless-error standard applies to review of an unobjected-to jury instruction raised in a postverdict motion only when the alleged error is one of fundamental law or controlling principle. *See State v. Glowacki,* 630 N.W.2d 392, 398 (Minn.2001); *State v. LaForge,* 347 N.W.2d 247, 251 (Minn.1984). In *Glo-*

*wacki,* the supreme court held that a new-trial motion preserved an error for appeal where the district court gave an erroneous instruction that a defendant had a duty to retreat before he used force against an offense in his home. 630 N.W.2d at 398–99, 402–03. In *LaForge,* the supreme court held that a new-trial motion preserved the issue when the instruction at trial was that a jury can presume intent contrary to the rule set forth in *Connecticut v. Johnson,* 460 U.S. 73, 103 S.Ct. 969, 74 L.Ed.2d 823 (1983). 347 N.W.2d at 251, 256. *Glowacki* and *LaForge* involved substantial errors in the instruction where the district court may have been operating under an erroneous view of the law at the time it gave the instruction. In such a circumstance, a contemporaneous objection was unlikely to lead the district court to cure its own error. *See Sanders,* 598 N.W.2d at 656.

■ Here, it is evident that the district court simply misspoke. Appellant's counsel did not object. Our review of the record convinces us that neither of counsel even noticed the district court's mistake. If the error had been as prejudicial as appellant now argues that it was, counsel could have—and should have—objected at trial. Additionally, the district court's error was not one of "fundamental law or controlling principle." Minn. R.Crim. P. 26.03, subd. 19(4)(f).[4] Because appellant did not object to the district court's instruction before deliberation, and the error was not one of fundamental law or controlling principle, our review is limited to the plain-error standard.

■ Under a plain-error analysis, appellant is required to establish "(1) an

---

4. In context, "sexual" could at least be considered a more specific subset of the word "social." The state argues at length that the two words are synonymous in context, but we need not engage in a searching inquiry of the contextual meaning of the two words. We conclude that the district court's wholly unnoticed slip of the tongue is not appropriate for review under the harmless-error standard.

error, (2) that is plain, and (3) that affects [appellant's] substantial rights." *State v. Watkins,* 840 N.W.2d 21, 28 (Minn.2013) (citing *State v. Griller,* 583 N.W.2d 736, 740 (Minn.1998) (other citation omitted)). "If the first three prongs of the plain-error standard are met, we then assess whether reversal is required to ensure the fairness, integrity, or public reputation of judicial proceedings." *Id.* (quotation and citations omitted).

■ The district court did not plainly err. It read the correct instruction for first-degree criminal sexual conduct, of which appellant was convicted beyond a reasonable doubt. The correct instructions for both counts were given to the jury in writing. None of the jurors inquired why the district court said "sexual" when it re-read the instruction on the third-degree charge. Like counsel, the jurors seem not to have noticed the fleeting misspoken word. It is exceedingly unlikely that the jury significantly relied on the district court's misreading of one word, when both attorneys and the district court either failed to notice the error when it happened or thought it of insufficient significance to raise the issue. We conclude that the single misspoken word in these instructions was neither plainly erroneous, nor affected appellant's substantial rights.

■ Appellant also raises several arguments in his pro se supplemental brief. His principal arguments appear to be that S.L.B. was not taking her medication for schizophrenia at the time of the offense, and given the evidence, the jury should have believed appellant and disbelieved S.L.B. and some of the other witnesses. Because these issues concern witness credibility and trial strategy, our review is highly deferential. *See State v. Nicks,* 831 N.W.2d 493, 506 (Minn.2013) (trial strategy); *State v. Dickerson,* 481 N.W.2d 840, 843 (Minn.1992) (witness credibility), *aff'd* 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993). Witness credibility and weight of testimony is for the jury to determine. *State v. Wright,* 679 N.W.2d 186, 190 (Minn.App.2004). We generally will not disturb the jury's decision on appeal. *See id.* The arguments raised in the pro se supplemental brief do not warrant appellate relief.

## DECISION

Because appellant relies on a comparison of raw census data with jury-pool demographic data which facially reveal plausible alternative explanations for the claimed underrepresentation of black persons on his jury panel, he fails to establish a prima facie case that the fair-cross-section requirement was violated. The district court did not abuse its discretion in admitting evidence of appellant's three prior felony convictions for impeachment, nor was appellant prejudiced by the fact or manner of their admission. The district court did not plainly err when it misread one word in the instruction for third-degree criminal sexual conduct, and appellant's pro se arguments do not entitle him to appellate relief.

**Affirmed.**